Argued May 27, reversed and remanded July 1, 1924.

## STATE *v.* CON FITZGERALD.

### (227 Pac. 306.)

**Criminal Law—Court Erred in Permitting Counsel to Bring into Court Dummy Cow.**

1. In prosecution for larceny of a cow, *held* that court erred in permitting counsel for state to bring into court a dummy cow, where there existed some question as to whether or not defendant had disposed of part of hide of alleged stolen cow; defendant having had no opportunity to cross-examine person sewing fractions of hide together and stuffing them.

**Criminal Law—Error in Bringing Dummy Cow into Court Held not Cured by Instruction to Disregard.**

2. Error in permitting state's attorney to bring dummy cow into courtroom, in prosecution for larceny of cow, *held* not cured by caution of court to jury to disregard dummy.

Larceny—Court Erred in Cattle Theft Prosecution, in not Permitting Witness to Testify That Various Parties Branded Cows Where Part of Skin was Missing.

3. In prosecution for larceny of cow, where skin of cow alleged to have been stolen was introduced in evidence, but place where brand should have been had been cut out, court erred in not permitting witness for defendant to testify that parties other than alleged owner branded cows at place where skin was missing from exhibit, notwithstanding that brand in such place would be in violation of law.

Larceny—No Error in Admitting Evidence of Alteration of Earmark in Cow.

4. In prosecution for larceny of cow, where there was evidence strongly tending to show that brand upon cow in question had been freshly cut out, there was no error in admitting evidence of alteration of earmark.

From Lake: J. M. BATCHELDER, Judge.

Department 1.

This is an appeal from a judgment of the Circuit Court of Lake County wherein the defendant was convicted of the crime of larceny of a cow, and sentenced to the penitentiary.

The indictment was returned on the eleventh day of May, 1922, and charged the defendant with the larceny of two cows. One of the cows was alleged to be the property of the Eastern Oregon Live Stock Company, and the other one the property of the Warner Valley Stock Company. The Eastern Oregon Live Stock Company is engaged in the cattle business, with headquarters in Harney County, and owns what is known as the FG brand, and is referred to .in the briefs as the FG Company. The Warner Valley Stock Company is engaged in the cattle business, with headquarters in Lake County, and owns what is known as the MC brand, which is designated by the brand MC on the right ribs, a swallow fork in the right ear, and a wattle on the right side of the neck, and the cattle belonging to this

company are referred to in the briefs as the MC cattle and will be hereafter so designated in this opinion.

On account of the failure of the state sufficiently to identify the cows, the court withdrew from the consideration of the jury all evidence referring to the FG cow, and this opinion will have mainly to do with the cow alleged to have been the property of the Warner Valley Stock Company.

The defendant in this case is engaged in the cattle and sheep business in Lake County, and owns what is known as the Snider Creek Ranch. This ranch consists of several hundred acres of meadow and pasture land, somewhat cut up by small canyons, and is located in an isolated part of the county, about fifteen miles northwest of the Plush postoffice. On or about the 20th of December, 1921, this ranch was visited by Ed Wright and Frank Loveless, who were employed by Chandler Brothers, and at this time they saw, it is alleged, in the Fitzgerald field and with the Fitzgerald cattle, about twenty-five head of FG cattle and one MC cow, but it was practically admitted that the MC cow seen by them was not the cow which is the subject of the alleged larceny.

In the early part of January, 1922, the Fitzgerald ranch was visited by one L. M. Kercherville, who was employed by the Eastern Oregon Live Stock Company, and who had information that some FG cattle were at the Fitzgerald ranch. He rode through the fields and inspected the cattle, by permission from Fitzgerald, but found no FG or MC cattle at that time. He returned to the Fitzgerald ranch several days later and requested Fitzgerald to allow him to look through the cattle again. This request was refused by Fitzgerald, who ordered him off the prem-

ises and proceeded to enforce his demand by threats, coupled with the somewhat menacing possession of a gun, which threats and menaces caused Mr. Kercherville to depart precipitately. Within a few days thereafter Kercherville again returned to the Fitzgerald ranch, this time in company with E. E. Woodcock, sheriff of Lake County, and Flint Vernon, his deputy; Sheriff Woodcock being armed with a search warrant. On making a search of the premises they found the carcasses of two cows that had the appearance of having been killed only a short time previously; the flesh on the cows being then fresh and frozen. These carcasses were some three-quarters of a mile southwest of the Fitzgerald ranch house, near what is designated as Rimrock, inside of the Fitzgerald fields. There was a considerable quantity of snow on the ground and at the place where the carcasses were found there was more or less sagebrush. Both carcasses had the appearance of having been carefully concealed. The carcasses of both cows had been mutilated. The head of the alleged MC cow had been cut off, her udder cut off, her entrails taken out, and a rather large space cut out of the right ribs, as well as other mutilations. The heads of the two animals had been taken away but were delivered to the sheriff by Fitzgerald after the sheriff had made rather urgent inquiries for them. A few days after the search was made Mr. Kercherville returned to the Fitzgerald ranch, in company with Sam Baty, S. P. Dicks, stock inspector, and Flint Vernon, deputy sheriff, at which time the carcasses were skinned and the hides brought to Lakeview, and were afterward, together with the skins taken from the heads of the carcasses, offered and admitted as exhibits in this case. The defend-

ant, at the time he produced the heads, admitted the killing of the two cows, but stated that he had killed them on account of rabies, and had saved the heads to have them tested, to see if the animals actually had that disease.

The state introduced in evidence the record of marks and brands of the Warner Valley Stock Company, which was regular in form, and which designated its brand as MC on the right ribs, and its earmark, as before stated, a swallow fork in the right ear, and a wattle on the right side of the neck. The evidence also tended to show that on the right side, in about the position where the Warner Valley Stock Company places its brand, a large piece of the hide of the alleged MC cow had been cut out previously to the finding of the carcass, which piece was never discovered. There was no evidence of the existence of a wattle on the right side of the neck, but the state claimed that the head had been cut off in such a manner that a portion of the neck hide was missing, and claimed that this accounted for the absence of the wattle. The defendant claimed that the head, where the neck joined the hide upon the body, was intact and that no portion had been removed.

The hide, as before stated, had been skinned from the animal, and also from the head, and its custody was accounted for to the extent of showing that it was in the same condition as when it was taken from the animal. The testimony showed that in the interim the two hide exhibits, the head and neck being one, and the balance of the hide the other, had become putrid, to the extent that their presence in the court-room created an intolerable stench. These two ex-

hibits are marked, respectively, state's exhibits G and H, and will be so referred to here.

The taking of the testimony having been concluded on the fifth day of June, 1922, the court adjourned for the day, and during the evening of that day Sam Baty, manager of the Warner Valley Stock Company, and a witness for the state in the prosecution of the case, with Harry Glazier, a harness-maker, who had no knowledge of or experience in taxidermy, and Deputy Sheriff Fleet, met in the basement of the County Court house, where Glazier sewed together a cowhide and the skin of a cow's head, the same being state's exhibits G and H, which had theretofore been offered and admitted in evidence upon the trial as exhibits on the part of the state, and stuffed the exhibits with excelsior and burlap, so that the same were made to resemble a cow. No permission was had of the court to make such use of the exhibits, no notice was given to defendant of the intention of the state so to use the exhibits, nor was any representative of the defendant present during the experiment; and until the stuffed cow was actually brought into the courtroom on the following day neither the defendant nor his counsel had any knowledge of the experiment. The following day, after counsel for defendant had completed his argument to the jury, and during the course of the closing argument made by S. A. Jetmore, special prosecutor on behalf of the state, the following proceedings took place: Mr. Jetmore, among other things, said:

"Don't you remember Sam Baty's testimony? All of you believe it. The fact remains that the grand jury believed him. I intend to show you by actual demonstration. [To sheriff.] Will you bring in that exhibit, please?"

The stuffed cow was brought in, the whole representing the body of a cow and having somewhat disproportionate parts, and was commented upon by counsel in the course of his argument. Immediately upon the dummy being brought into the courtroom counsel for defendant objected to its presence there. In answer to these objections Mr. Jetmore said:

"The purpose, as I understand, is that we have a right in the argument of a case to refer to the exhibits, and it is in reference to the exhibits that I am about to engage in right now, commenting upon the exhibits that are in evidence. And as to any difference in the appearances, that would not change the right of argument."

Counsel for defendant said:

"I said 'refer to the exhibits as they were introduced in the trial.' Further than that, if your honor please, I think myself that this is just stage play. He knows that he is going to be ruled out."

The court then made the following statement:

"It is my judgment that the exhibits in the case are the subject of legitimate argument. If I can make it clear without saying anything improper—what I mean to say is that the attitude in which they are placed is purely a question of argument; the argument to be limited to that subject. The condition of the exhibits are matters for the jury, whether they are just the same now. For example, a certain piece of property, a mirror or something of that kind, broken, is a subject of larceny. It would be within the bounds of legitimate argument to permit the pieces to be adjusted and discussed before the jury."

The court further said, in answer to objection by counsel for defendant to the foregoing remarks:

"Gentlemen of the jury, please do me the kindness to understand that I am not arguing, and the biggest kindness you can give me is that whatever I

might say is in order to make it plain to the jury the ruling of the court. I desire you in no sense to take anything into consideration that I have said on this subject in the rendering of your verdict.''

Further:

''I think the comparisons of the exhibits are proper argument, but they are in no sense testimony.''

The discussion of the admissibility of this dummy continuing, the jury was excused during the pendency thereof, and Mr. Conn, of counsel for defendant, said:

''We desire to have the record show that, over objection, the carcass of the animal, or the hide from the body and the hide from the head, and after it had been wet and was made soft and pliable, had been permitted by the court to remain in the sight of the jury for at least five minutes, and that before being brought in and while it so remained, it was padded up into something resembling the form of an animal, with excelsior and burlap, and that no such representation of state's exhibit H, being the head of the animal referred to as the MC cow, and state's exhibit G, being the hide of the animal referred to as the MC cow, had been exhibited to the jury in such condition at any time during the introduction of evidence.''

By the court:

''I think the testimony was something to the effect that some witness laid the hide down here on the floor and put the head where he claimed the head should be with reference to the hide. Well, I believe that this class of testimony is permissible for the purpose of explaining that kind of testimony. It is an argument for or against that class of testimony. Now, of course, I understand that before the exhibit is removed that stuffing should be taken from it, and it is subject to the inspection of the jury as to whether it is in any manner changed.''

After a long discussion, the court said:

"I think the comparisons of the exhibits are perfectly legitimate arguments to the jury."

By Mr. Hay, of counsel for defendant:

"It wasn't a stuffed cow admitted in evidence. It was merely a hide and head."

By the court:

"This was merely to facilitate the comparison itself."

After further discussion the court said:

"This is, as I view it, merely an argument, and the question is whether counsel in making the argument has a right to adjust the pieces, towards the view of explaining, rather than the view of arguing, the relative position of the pieces one way or the other."

The court then directed the jury to be taken to dinner and to be kept from the courtroom until the argument was concluded. In the interval the stuffing was removed from the exhibits, and when the jury came in the court said:

"Gentlemen of the jury, that was what we would call a dummy, I suppose, just prior to the adjournment, upon which were placed some of these exhibits. I desire to instruct you that you will not take that circumstance into consideration in arriving at a verdict, nor draw any inferences one way or another from the fact that the dummy was brought into court."

The bill of exceptions makes the following recital:

"At the time when said stuffed cow was brought into the courtroom, the room was crowded with spectators, many of whom together with several of the jurors, at the moment when the dummy was carried through the doorway by the officers, sprang to

their feet. During all the time while said dummy was permitted to remain in view of the jury, spectators and jury alike, observed and inspected the same closely and intently. The atmosphere of the courtroom was surcharged with intense excitement, and the situation was dramatic and intense.''

In the course of the testimony the state introduced testimony which it was claimed tended to show that the earmarks upon the cow had been altered, leaving some portion of the MC's original earmark without alterations; to the admission of which testimony in regard to the earmark defendant objected, and at the close of the case also moved to strike out all testimony in regard to earmarks, on the ground that such testimony was not accompanied by any evidence tending to show that there was an MC brand upon the animal; which motion was overruled by the court.

Another error is predicated upon the refusal of the court to admit the following testimony: Philip O'Connor, a witness for the defendant was asked,

''Q. Are you familiar with the brands of different people in Warner Valley and vicinity? A. I am.

''Q. Do you know anybody else over there [referring to others than the MC Company] that brands on the right ribs?''

To this question the court sustained an objection on the theory that parol evidence could not be admitted to show that other persons in the vicinity branded their cattle upon the right ribs.

Another exception is predicated upon the refusal of the court to allow the witness Baty to answer the following question asked him upon cross-examination:

''Isn't it a fact that you are testifying that you know this cow outside of her marks and brands, so that you can identify her that way before the jury and convict this defendant?''

This was objected to by the state and the objection sustained.                REVERSED AND REMANDED.

For appellant there was a brief over the name of *Messrs. Conn, Hay & Gibbs,* with oral arguments by *Mr. L. F. Conn* and *Mr. Arthur D. Hay.*

For respondent there was a brief over the names of *Mr. T. S. McKinney,* District Attorney, *Mr. W. W. Cardwell,* and *Mr. S. A. Jetmore,* with an oral argument by *Mr. Cardwell.*

McBRIDE, C. J.—1, 2. We think the court erred in permitting counsel for the state to bring into court the dummy cow, the presence of which was objected to by defendant's counsel. The custodian of exhibits G and H was properly the clerk of the court, and nobody else had any business with them unless designated by the court as their custodian. In the form in which they were produced they constituted, to a certain extent, new testimony. Counsel, in any event would have the right to cross-examine the witness performing the taxidermic operation as to the method in which the pieces of hide were put together to produce the similitude which was brought into court, whether by stretching the hides to make them meet, or by drying them so as to leave a ridiculous hiatus between the neck and the body part of the hide, which might tend to show, on observation, that it was impossible that all of the neck hide was present. It is possible that such an operation, performed in the presence of the jury, might not have been erroneous, but for unauthorized persons, connected with the prosecution either as witnesses or otherwise, to take such a liberty with the exhibits, then to bring them

111 Or.—30

before the jury when counsel for the defendant had had no opportunity to cross-examine, was a dangerous liberty which should not have been exercised, and the effect of it upon the jury might have been sufficient to turn the scale from a verdict of acquittal to a verdict of guilty. One of the constitutional rights of an accused person is to meet his witnesses face to face and be tried upon the evidence as it is produced in court, and not upon evidence after it has been mutilated and manipulated by hostile parties, and when any right of this character is violated to the extent that it was in this case it remains only for this court to reverse the judgment. Under the circumstances detailed here the caution of the court to the jury to disregard the dummy came too late and did not cure the error committed by allowing the close inspection that had been made by the jury, especially after that impression had been "rubbed in" by saying in the presence of the jury, in substance, that in the court's judgment the exhibition was not improper.

3. We also think it was error in not allowing the witness O'Connor to answer the question propounded to him, set out above. Our statute very properly prohibits evidence of ownership of stock in certain cases except by showing properly recorded brands, and even makes it a misdemeanor for a person to use an unauthorized brand; but the question asked of the witness O'Connor was not directed to proving ownership, but to proving a particular fact, namely, that other persons in the vicinity branded upon the right ribs, which would have a tendency to indicate that, even if the brand had been cut out from that location on the alleged MC cow, it might have been the brand of some other party than the Warner Valley Stock

Company. Nor would it destroy the efficacy of the evidence that the use of such brand was unauthorized and even in violation of the law, if it was the custom of other people in the vicinity, either authorized or unauthorized, to brand in the location where, apparently, a brand had been cut out. The evidence was relevant and should have been admitted.

4. There was no error in the court's admitting evidence of the alteration of the earmark, under the circumstances in this case. There was evidence strongly tending to show that a brand placed upon the cow in question had been freshly cut out, presumably with a criminal design to obliterate, and that it had been cut from that portion of the animal where the MC people were accustomed to brand and had a right to brand. The record evidence also showed the fact that the Warner Valley Stock Company had a right to use the MC brand and to put it upon that part of the animal's anatomy. The statute (Or. L., § 9168, as amended by Laws 1921, p. 264) provides that evidence of earmarks may be admitted in connection with the brand; that is, evidence of the brand. There was evidence of the brand, and record evidence of it, and some slight evidence tending to show that before its obliteration it might have been upon this cow. The statute is technically satisfied, which is all that was required, because, but for the statute, the evidence would have been clearly admissible, whether there was any brand upon the cow or not, and we are not disposed so to construe the law as to enable a person to exclude testimony by obliterating it when there is a good technical reason for its admission.

Other than the matters heretofore stated, the case was very carefully tried, and we find no other errors in the record. New and difficult questions were

before the court and this will continue to be the case until the law in regard to marks and brands is revised in accordance with the dictates of justice and common sense. So far those framing the law have, apparently in the supposed interest of a stock raising community, drawn the lines in regard to the admission of evidence so strictly as rather to injure than promote the protection of livestock; but with that we have nothing to do, but must enforce the law as we find it, and, not infrequently, with reluctance.

For the errors herein referred to the judgment of the lower court will be reversed and the cause remanded for a new trial.

                              REVERSED AND REMANDED.

BURNETT, RAND and COSHOW, JJ., concur.